IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GABRIEN BIRDSONG                        )
                                        )
        Plaintiff,                      )
vs.                                     )         CIVIL ACTION NO. 1:19-252-KD-N
                                        )
GOVERNOR KAY IVEY, *et al.*,            )
                                        )
        Defendants.                     )

## REPORT AND RECOMMENDATION

Plaintiff Gabrien Birdsong, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983.  This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R).  This matter is before the Court on Defendants' motion for summary judgment.[1]  (Doc. 44).  For the reasons discussed herein, it is ordered that this motion be granted in part and denied in part.

## I.      BACKGROUND AND FACTUAL ALLEGATIONS[2]

## A.      Amended Complaint.

Plaintiff, who is serving a life without parole sentence for capital murder/robbery, asserts that Defendants, Governor Kay Ivey, Alabama Department of Corrections Commissioner Jefferson Dunn, Warden Cynthia Stewart, Warden Terry Raybon, Captain Regina Bolar, Lieutenant Cassandra Dailey, Correctional Officer Curtis Thompkins, Holman's Classification

---

[1]      The Court converted the Defendants' Answers and Special Reports to a motion for summary judgment.  (Docs. 29, 30, 35, 36, 42, 43).

[2]    The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." <u>Priester v. City of Riveria Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

Officer William DeSpain,[3] Alabama Department of Corrections Classification Director Cassandra Conway,[4] failed to protect him from an inmate attack at Holman Correctional Facility ("Holman") on April 26, 2019.

In his complaint, Plaintiff alleges that he was stabbed nineteen times, by eleven armed inmates, including Kelvin Hines, an alleged known enemy.  (Doc. 7 at 3).  He alleges that earlier that same evening (approximately an hour earlier), he and inmate Kelvin Hines had "unfriendly words" with each other, and Plaintiff asked Lieutenant Dailey and Officer Thompkins to move him from A-Dorm to B-Dorm "for fear of being in a physical confrontation with Kelvin Hines".  (*Id*.).  Plaintiff further alleges that in response to his request, Lieutenant Dailey and Officer Thompkins told him, "you need to get a knife and defend yourself as best as possible, because we don't do movements."  (*Id*. at 7).  The incident happened about an hour later.  Plaintiff alleges that during the stabbing, he pleaded, begged, and ran for his life "inhope of being aided and assisted by C.O.I.'s of this institution, before exiting A-Dorm with no assisten[ce] from any C.O.I.'s."  (*Id*.).  Following the incident, Plaintiff was taken to a medical trauma center for treatment and received hospital care for a week before returning to Holman.

In addition to requesting a move from A-Dorm to B-Dorm from Lieutenant Dailey and Officer Thompkins, Plaintiff alleges he personally spoke to Warden Cynthia Stewart, Terry Raybon, and Captain Bolar about separating him from inmate Kelvin Hines prior to being stabbed. According to Plaintiff, he informed Raybon, Bolar, and Stewart that he and Inmate Hines were

[3]  In his complaint, Plaintiff names "John/Jane Doe 2 employed at Holman institution as classification officer" as a defendant.  (Doc. 7 at 8).  William DeSpain answered the suit and

affirmed he is employed as the Classification Supervisor at Holman.  (Doc. 29-2). 4   In his complaint, Plaintiff names "John/Jane Doe 1 employed as head classification officer".  (Doc. 7 at 8).  Cassandra Conway has answered the suit and affirmed by personal affidavit that she is that Classification Director for the ADOC.  (Doc. 42-1).

"enemies and [of their] gang affiliation difference, and [that they] needed separating and transferred before the stabbing" on April 26, 2019.  (Doc. 7 at 7).  He further asserts that documentation existed in the Alabama Department of Corrections' files declaring the same. Plaintiff alleges when he spoke to Warden Stewart, she informed him that she would personally look into the matter, as soon as possible, and one of the two inmates would be transferred if the investigation revealed an "ADOC, Keep Separate Order" based on gang affiliation differences. (*Id*. at 7).  Plaintiff claims Warden Raybon stated, after the stabbing incident, "I had no idea how Central records, failed to notify the warden or this prison, classification administration, that Plaintiff and Hines was enemies."  (*Id*. at 8).

Plaintiff claims Defendants were indifferent to his health and safety for leaving him in ADorm with an alleged enemy and asserts that he has not been provided psychological counseling or post trauma treatment following the incident.  Plaintiff further alleges that Holman is a "dangerous environment" (having had 56 inmate-on-inmate stabbings under Warden Stewart, since June 16, 2018), due to overcrowding and understaffing, of which Defendants Ivey, Dunn, Stewart, Raybon, Bolar, Dailey, and Thompkins were aware and for which they are responsible. He requests a three-judge court pursuant to 18 U.S.C.S. § 3626 or compensatory damages in the amount of $150,000.00 from each defendant jointly and severely and punitive damages in the amount of $100,000.00, as well as what is deemed just and appropriate by the court.  (Doc. 7 at 6).

**B.    Defendants' Answers and Special Reports.**

Defendants have answered the suit and denied the allegations asserted against them. Defendants maintain that prior to April 26, 2019, Plaintiff and inmate Hines were assigned to the

same institution, Holman, for over 4 months, and resided in the same dorm for 3 months, without incident. Defendants assert that Inmate Hines was not a "known enemy" prior to April 26, 2019. Thus, Defendants argue that Plaintiff has failed to meet the objective and subjective elements necessary to establish his claim. (Doc. 29 at 15-16). They further argue that the supervisory officials are not liable under the theory of *respondeat superior*. (*Id*. at 16-17; Doc. 36; Doc. 42).

In support of their denials, Defendants (with the exception of Governor Kay Ivey) have submitted personal affidavits in response to the allegations asserted against them, which are summarized as follows:

Warden Cynthia Stewart avers that she was not present at Holman on April 26, 2019, when the incident occurred. She further avers that the institutional files do not reveal or document that inmates Birdsong and Hines had an enemy situation, nor did Plaintiff ever speak to her regarding any enemy situation. She affirms that following the incident the two inmates were confirmed as enemies. Warden Stewart also affirms by affidavit that prison records indicate that Plaintiff was referred to Mental Health on May 5, 2019 and was seen by a mental health professional on May 9, 2019. (Doc. 29-1).

Classification Officer William DeSpain avers that prior to the incident of this complaint, no information had been provided by the inmates indicating that inmates Birdsong and Hines should be declared enemies. DeSpain explains that when inmates are aware of a situation outside of prison (with another inmate), they usually indicate that they should be documented as enemies upon intake at Kilby. There is no indication of this occurring in this instance. (Doc. 29-2).

Warden Terry Raybon avers that he never advised Plaintiff of knowing of a possible enemy situation existing between him and inmate Hines as alleged. Instead, he affirms that prior to the incident, Plaintiff and inmate Hines were incarcerated without incident and that Plaintiff never indicated that there was an issue with inmate Hines. He further affirms that policies and procedures are in place to lessen the incidents such as stabbings, i.e., officers are required to conduct five random searches of the inmates and their personal property daily, monthly area searches of the institution are conducted, and the times and patterns of the searches vary. (Doc. 29-3).

Lieutenant Sandra Dailey avers she had no knowledge of Plaintiff having a known enemy living in the same housing unit. She further avers had Plaintiff notified her of this enemy, she would have pulled his enemy list and separated the two inmates. Lieutenant Dailey affirms that she never instructed Plaintiff to get a knife and defend himself. (Doc. 29-4).

Correctional Officer Curtis Thompkins avers he did not advise Plaintiff to get a knife and defend himself and avers he does not have the authority to move or transfer inmates from dorm to dorm (which requires supervisory approval). (Doc. 29-5).

Commissioner Jefferson Dunn avers that he has no personal knowledge of the matters alleged in Plaintiff's complaint and has not received a grievance regarding the incident. He further avers that he does not handle the day-to-day operations at Holman. (Doc. 29-7).

Captain Regina Bolar avers that she has no personal knowledge of the matters alleged by Plaintiff regarding the inmates who allegedly attacked him or the alleged conditions of confinement. She affirms that on the night of the incident, she was the officer on call and responded to the incident upon notification of the inmate-on-inmate assault. She entered the facility and went to the health care unit to escort one of the other inmates to Atmore Community Hospital. She further affirms she had no communication with Plaintiff on the night of the incident; neither did she communicate with Plaintiff prior to incident regarding a potential enemy or gang situation or after the incident. Specifically, Plaintiff never communicated to Captain Bolar that he needed to be separated and transferred due to his alleged enemy, inmate Kelvin Hines. (Doc. 37-1).

ADOC Classification Director Cassandra Conway avers that after review of Plaintiff's record, she sees "no indication that Classification personnel had ever been advised of a need to designate Kelvin Hines as an enemy of Plaintiff prior to the April 26, 2019 incident. (Doc. 42-1).

Defendants have also submitted the April 26, 2019 Incident Report which indicates that Plaintiff and inmate Himes were involved in a verbal argument in A-Dorm's TV room that escalated into A-Dorm near Plaintiff's bed. (Doc. 29-6 at 3). Inmate Hines became aggressive as he was continuing to argue with Plaintiff and a physical altercation began between two beds that spilled into the aisle way. As Inmate Hines punched Plaintiff, two other inmates began to stab Plaintiff. Cubical 2 Officer Dennis Pickett witnessed three inmates, including Plaintiff, walking towards the entrance gate of the dorm with blood on their shirts.5 Officer Pickett called a code for Housing Unit A, to which Lieutenant Dailey and Officer Craft responded. The inmates were removed and escorted to the health care unit (where they were subsequently transferred to the local hospital for further medical treatment). (Doc. 29-6 at 2-3).

Provided prison documents also reflect that on the evening of April 26, 2019, all cubicles were assigned officers, but there was no officer assigned to A-Dorm. (Doc. 29-6 at 16). Lastly, Defendants submitted the Alabama Department of Corrections (ADOC) Enemy List, which shows

5 The Incident Report indicates that two other inmates in A-Dorm were stabbed at the same time as Plaintiff.  (Doc. 29-6 at 2).  A total of 12 inmates were charged as suspects in the incident, with Hines and two other inmates involved in the stabbing of Plaintiff.

that Inmate Kelvin Hines was validated as an enemy of Plaintiff following the April 26, 2019

incident and not before.  (*Id*. at 17).

The court converted Defendants' answers and special reports (Docs. 29, 30, 35, 36, 42, 43)

into a motion for summary judgment.  (Doc. 44).

**C.     Plaintiff's Response to Defendants' Motion for Summary Judgment.**

Plaintiff contends that his Eighth Amendment rights were violated as a result of Defendants'

deliberate indifference to an "imminently dangerous situation" in A-Dorm.  (Doc. 46 at 2).  He

claims that: (1) A-Dorm was controlled by gangs and had a history of serious gang violence; (2) he

and inmate Kelvin Hines were members of rival gangs, and (3) he "received word that Kelvin Hines

stated he did not trust Plaintiff or felt threaten[ed] in plaintiff['s] presen[ce]" (and Plaintiff states

he "felt unsafe" in Hine's presence).  (Doc. 46 at 2).  Plaintiff further claims that he informed

"prison officials" that he was not safe in A-Dorm for these three reasons.  By sworn affidavit,

Plaintiff testifies that on December 12, 2018, he spoke directly with Warden Stewart about these

fears, namely that he was "in fear of a validated enemy" and imposing threat on his life.  (Doc. 4813

at 1).  He affirms he reiterated these same concerns in a typed, "hand mailed" March 3, 2019 letter,

which reads:

Dear Mrs. Steward, Warden III,

I am typing this letter to be a reminder of what we talked about **December 12, 2018 approximately  9:30  a.m**.  concerning  validated  enemy  situation  with  me  and **Kelvin Hines, AIS #197526A as an <u>"ADOC, Keep Separate Order,"</u>** the exact reason I'm incarcerated.  You gave me your word, you would look into this matter an if any validated enemy, listed in my file jacket turn up, with me and Kelvin Hines as enemies, you would attend to the matter that would result in one of us being separated and transferred.

In regards of facts we haven't had words, I do not trust this individual at no time, especially since our **gang affiliation puts us at odds with one another, and our street drama in the past, along with facts words from a neutral friend, Kelvin Hines stated he felt threaten being around me in the same environment.**

There's been over fifty-six (56) stabbing, and a murder in **A-Dormitory**, and I would like to be moved due to the fear I feel for my life!  Especially where an enemy listed in my administrative file feel threaten in my presence and our gang affiliation differences, that puts us at odds withoneanother.

I beg of you to move one of us, as well as transfer one of us, I've verbally spoke with **Terry Raybon, Warden II, and Regina Bolar, Captain,** and begged of them to have me or him separated and transferred before another stabbing or murder occurs, like the stabbing and murder just occurred with the young rival gangmember last December 2, 2018, prior to the arrival of Kelvin Hines.

Sincerely yours,
Gabrien Birdsong #186723

(Doc. 48-14).  In support of his allegation that A-Dorm was inherently dangerous and that Defendants were indifferent to his safety, Plaintiff submits two newspaper articles that reference the overcrowding, understaffing, violence, and lack of safety in Alabama prisons,[6] a disciplinary report from a nonparty inmate found guilty of stabbing another inmate in February 2018 (Doc. 4819), and he submits that the reason no guard was present inside A-Dorm at the time of the attack is because officers are never posted inside the dormitories for fear of their safety.  (Doc. 46 at 2).  Plaintiff further alleges that in the three months he was housed in A- Dorm, he witnessed 35 stabbings and describes the murder of a rival gang member ("Westgate").  (Doc. 48-13 at 2).

Plaintiff also filed two motions for discovery.  (Docs. 47, 49).  The first motion puts forth 18 broad scope production requests, including copies of "all grievances, complaints, or other documents received by defendants" Stewart, Raybon, Bolar, Dailey, and Thompkins; copies of

6 Plaintiff submits an *USA Today* article, dated Friday, August 23, 2019, which references that United States' Department of Justice's "scathing review" of Alabama's prison system and notes the risks of suicides, violence, and sexual abuse where people are "murdered 'on a regular basis'". (Doc. 48-16). Plaintiff also submits a *Selma Times-Journal* article describing Alabama prisons as "cesspools of violence, rape, black-market commerce, extortion, suicide and mismanagement", which are "understaffed and overwhelmed." (Doc. 48-15). The undated article provides quotes from incarcerated inmates detailing their stories and fears in Alabama prisons. (*Id*.).

various administrative regulations; complete copies of Plaintiff's prison records; copies of "all

documents" from 2010-2018 that "contain, mention, construe, or refer to" prison violence, inmate

assaults, injuries suffered by inmates and staff due to assaults, and the responses to such documents

from Holman Correctional staff or their agents. (Doc. 47). The second motion generally requests

documents related to violence at Holman and in A-Dormitory, to prove that the defendants were

aware of the "longstanding, pervasive, well-documented" substantial risk of inmate-on-inmate

attacks. 7 (Doc. 49).

**D.     Defendants' Reply to Plaintiff's Response to the Motion for Summary Judgment.**

Defendants filed a Reply to Plaintiff's Response to the summary judgment motion

challenging Plaintiff's continued assertion that Inmate Hines was a known or validated enemy

before the April 26, 2019 incident, as well as Plaintiff's inclusion of "embellished and/or new

allegations and misguided references." (Doc. 54 at 1). Specifically, Defendants point to Plaintiff's

new allegations that he "informed prison officials that he was not safe in A-Dormitory because (1)

A-Dormitory housed and was controlled by gang-affiliated inmates and had a recent history of

serious gang-related violence; (2) Plaintiff and Kelvin Hines were rival gang-members of different

sets, and had a past history of beefing from the street, concerning plaintiff case; and (3) Plaintiff

had received word that Kelvin Hines stated he did not trust Plaintiff or felt threaten in plaintiff

present, as plaintiff felt unsafe in Hines present" and distinguish these from Plaintiff's complaint

7  Plaintiff requests: (1) all incident reports from inmate-on-inmate assaults involving the use of weapons, (2) incident reports of inmate assaults on ADOC officers from 2010-2018, (3) incident reports of inmate-on-inmate assaults involving a weapon which resulted in the death of an inmate and/or prison official from 2010-2018, (4) names of inmates assaulted with a weapon that resulted in injury or death of inmates housed in A-Dormitory on December 2, 2018, (5) the name of the correctional officer assigned to A-Dorm on April 26, 2019, (7) all employee complaints regarding security hazards within Holman from 2010-2018, and (8) all known administrative policies regarding security in A-Dorm.  (Doc. 49 at 1).

allegations, which claim he spoke with Officer Thompkins and Lt. Dailey on April 26, 2019 about

moving him for fear of him being in a physical confrontation with inmate Hines, because the two

had just had "unfriendly words".  (Doc. 54 at 1-2).

Defendants, through the affidavit of ADOC Commissioner Dunn, "categorically deny

Plaintiff's broad-brushed and unsubstantiated allegations . . . that there has been a failure to 'find

a remedy to the growing population at Holman Corr. Facility, causing the increase of violence,

assaults, stabbing and deaths of prisoners and correctional officers' and alleged 'overcrowding; the

primary cause of the violence and deaths.'"  (Doc. 54-1 at 2).  Throughout his affidavit, Defendant

Dunn details various improvements he (at the direction of the governor) have made to improve the

overall conditions of Alabama prisons, including increasing security staffing, decreasing inmate

population, decreasing the levels of violence, decreasing the amount of contraband entering the

facilities, and increasing available inmate programs.  (Doc. 54-1).

Also, Warden Stewart reaffirms that she has never spoken to Plaintiff regarding any enemy

situation, including a discussion on December 12, 2018, nor did she receive a letter on or about

March 3, 2019 regarding a previous discussion.  (Doc. 54-2).  She does admit that there was a

homicide at Holman on December 2, 2018 due to an inmate-on-inmate assault.  (*Id*. at 2).

Furthermore, Warden Raybon reaffirms that he never advised Plaintiff of knowing of an

enemy situation between him and Inmate Hines.  He further affirms that he was never informed by

Plaintiff or knew that Plaintiff had an issue with Inmate Hines prior to the April 26, 2019 incident.

Furthermore, he avers that the post assignment log for the night in question reflects an adequate number of staff on duty to provide security for all the dorms.  (Doc. 54-3).

Defendants also filed a Motion to Strike submissions put forth by Plaintiff in his Response, (specifically, the *Selma Times-Journal* article, excerpt from *USA Today*, and the February 18, 2018 Disciplinary Report of a nonparty inmate) and portions of Plaintiff's pleading that reference and/or rely on these documents or the findings by the Department of Justice. (Doc. 55).  Defendants assert these documents are prejudicial, arguing Plaintiff's attempt to interject extraneous matters into this action which are irrelevant, improper and/or designed to prejudice the Defendants.  (*Id.*).

The court determines, after review of Plaintiff's submissions, the documents describe general problems plaguing the Alabama prison system, as a whole, including understaffing, overcrowding, and violence, but do not form the basis of showing Defendants had knowledge that Plaintiff faced a risk of harm from being housed in Holman's A-Dorm.  Thus, even if taking judicial notice of the submissions (*USA Today* excerpt, *Selma Times-Journal* article, and Disciplinary Report) were appropriate, the documents would not advance Plaintiff's case, as they fail to contain any details related specifically to Holman, Holman's A-Dorm, and/or the time period in question.

The court hereby **ORDERS** the **Motion to Strike** (Doc. 55) is **DENIED** as **MOOT**.

## II.   MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact.") (emphasis in original); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis in original) (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.'" Id. (citations omitted).  A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id*.  In addition, "[t]here is no burden upon the

district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

## III.   DISCUSSION AND ANALYSIS

### A.   ELEVENTH AMENDMENT IMMUNITY.

To the extent Plaintiff attempts to sue Defendants in their official capacities (as the State of Alabama Governor, Commissioner of the Department of Corrections, and state correctional officers) and seeks any type of monetary award, the defendants are entitled to absolute immunity from suit, as official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Id.*, quoting in large measure *Lancaster v. Monroe Cnty*, 116 F.3d 1419, 1429 (11th Cir. 1997). Accordingly, Defendants, all employed by the State of Alabama, are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429.

### B. EIGHTH AMENDMENT FAILURE TO PROTECT.

"The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison." *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003); *see also Bass v. Perrin*, 170 F.3d 1312, 1316 (11th Cir. 1999). The Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "'[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (some internal quotation marks omitted). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981). Additionally, "[b]eyond just restraining prison officials from inflicting 'cruel and unusual punishments' upon inmates, '[t]he Amendment also imposes duties on these officials, who must ... "take reasonable measures to guarantee the safety of the inmates."'" *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1319-20 (11th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

Under the Eighth Amendment, prison officials have a duty to "ensure reasonable safety" of inmates, "a standard that incorporates due regard for prison officials' unenviable task of keeping

dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844-845. However, "a prison custodian is not the guarantor of a prisoner's safety", *Purcell ex rel. Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted), and "[i]t is not[] every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Prison officials must "take reasonable measures to guarantee the safety of the inmates", *Hudson v. Palmer*, 468 U.S. 517, 52627, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984), but there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not. . . ." *Farmer*, 511 U.S. at

838. It is a defendant's deliberate indifference to a known, significant risk that violates the Eighth Amendment. *Lane v. Philbin*, 835 F. 3d 1302 (11th Cir. 2016).

To establish a § 1983 claim for deliberate indifference, Plaintiff must show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Id.* at 1307. The first, objective, element requires the plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Id.* The second, subjective, element requires showing that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . also draw the inference." *Farmer*, 511 U.S. at 837. Again, it is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. *See, e.g., Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and

Unusual Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed

2d 251 (1986). "The known risk of injury must be a strong likelihood, rather than a mere possibility

before a [state official's] failure to act can constitute deliberate indifference." *Brown v.*

*Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).

Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under

section 1983." *Id.*

     Turning to Plaintiff's allegations, there is no dispute that on April 26, 2019, Plaintiff was

assaulted in A-Dorm at Holman Correctional Facility ("Holman"). Video footage reviewed by

prison officials confirmed that Inmate Kelvin Hines and Plaintiff were involved in a verbal

argument in A-Dorm TV room that escalated into a physical altercation in A-Dorm near Plaintiff's

bed. As Inmate Hines punched Plaintiff, other inmates began to stab Plaintiff. (Doc. 29-6 at 3).

The assailants were identified and placed in the restrictive housing unit. The body chart completed

immediately following the incident confirms that Plaintiff was stabbed approximately 23 times and

suffered a "diminished left lung". (Doc. 29-6 at 5). The court will address the liability of each

defendant individually, "taking into account the duties, discretion and means of each defendant."

Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982) ("[T]he critical causation issue here

must be whether each individual defendant was in a position to take steps that could have averted

the stabbing incident at Holman but, through callous indifference, failed to do so.").

### Classification Officers DeSpain and Conway

 Plaintiff claims that the classification officers DeSpain and Conway are responsible for the health

and safety of inmates "by keeping enemies separated", and their failure to do so, here, caused his

harm. (Doc. 7 at 8). The record, however, belies Plaintiff's claim that Inmate Hines was a

validated enemy prior to his transfer to Holman. Indeed, the record confirms that Inmate

15

Hines was not validated as Plaintiff's enemy until after the April 26, 2019 attack, and no genuine issue exists as to this fact, despite Plaintiff's conclusory allegation to the contrary.  Notably, Plaintiff provides no details regarding listing Inmate Hines as an enemy upon his incarceration with the Alabama Department of Corrections ("ADOC") (that is, during intake at Kilby Correctional Facility).  Plaintiff also provides no allegation that he ever spoke with Classification Officer DeSpain or Conway (or any classification officer) and requested that the two be confirmed enemies while at Holman.  Plaintiff further fails to provide any facts describing the specifics of the history between the two inmates to substantiate the claim that the two were enemies and posed a danger to each other, beyond the blanket assertion that they had "street drama in the past", which is not alleged to have been told to Defendants DeSpain or Conway.  (Doc. 48-14).  Instead, the record evidences that Plaintiff and Inmate Hines resided peacefully for four months in the same prison, three months in the same dorm, that Plaintiff never requested protective custody (only a transfer to another dorm or prison), and no incident or threat occurred between the two inmates before April 26, 2019.   Consequently, no evidence exists which would allow a reasonable jury to conclude that Plaintiff faced a substantial risk of serious harm from Inmate Hines that was ever known to Classification Officers DeSpain and Conway, and summary judgment should be **GRANTED** in their favor.

### Governor Kay Ivey and Commissioner Jefferson Dunn

Plaintiff claims Defendants Ivey and Dunn acted with deliberate indifference to his safety by failing to properly hire and train officers, failing to properly secure the prison, and by failing to oversee the reasonable reduction of overcrowding.   (Doc. 7 at 4; Doc. 46 at 4).

It is undisputed, here, that neither Defendant Ivey nor Dunn is responsible for the day-today operations of Holman, and Plaintiff has not alleged any facts suggesting that either subjectively

knew that Inmate Hines was a threat to his safety.  Therefore, to establish liability on the part of

these defendants, Plaintiff must show that they had a causal connection linking their actions to the

alleged constitutional violation, *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) ("Supervisory

liability under section 1983 may be shown either by the supervisor's personal participation in the

acts that comprise the constitutional violation or the existence of a causal connection linking the

supervisor's actions with the violation."), which he fails to do here.

> The necessary causal connection can be established "when a history of widespread
> abuse puts the responsible supervisor on notice of the need to correct the alleged
> deprivation, and he fails to do so." *Gonzalez*, __ F.3d at __, 2003 U.S. App. LEXIS
> 5762, 2003 WL 1481583, at *5 (quoting *Braddy v. Fla. Dept. of Labor & and
> Employment*, 133 F.3d 797, 802 (11th Cir. 1998)); *Brown*, 906 F.2d at 671.
> Alternatively, the causal connection may be established when a supervisor's
> "'custom or policy . . . result[s] in deliberate indifference to constitutional rights'"
> or when facts support "an inference that the supervisor directed the subordinates to
> act unlawfully or knew that the subordinates would act unlawfully and failed to
> stop them from doing so." *Gonzalez*, __ F.3d at __, 2003 U.S. App. LEXIS 5762,
> 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th
> Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale*, 7
> F.3d 1552, 1560-61 (11th Cir. 1993).  "The standard by which a supervisor is held
> liable in [his] individual capacity for the actions of a subordinate is extremely
> rigorous." *Gonzalez*, __ F.3d at __, 2003 U.S. App. LEXIS 5762, 2003 WL
> 1481583, at *4 (internal quotation marks and citation omitted).

*Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003).

Plaintiff challenges overcrowding as the primary cause of violence at Holman and cites to

*Braggs v. Dunn*, 257 F.Supp. 3d 1171 (M.D. Ala. 2017) and the April 2, 2019 United States

Department of Justice Investigation of Alabama's State Prisons for Men Report [8] for the

proposition that Defendants Ivey and Dunn were aware of the substantial risk of harm he faced in

A-Dorm at Holman and acted with deliberate indifference to that risk.  Even if the court were to

find Plaintiff's evidence sufficient to establish overcrowding or understaffing,[9]  Plaintiff would

[8]     *See* https://www.justice.gov/crt/case-document/file/1149971/download   (last   visited September 3, 2020).

[9]     Neither of *Braggs* nor the U.S. Department of Justice's Investigative Report, however, established Plaintiff's burden.  First, *Braggs* resolves Phase 2A of an Eighth Amendment claim of unconstitutional conditions and inadequate care for a group of seriously mental ill state prisoners incarcerated at Tutwiler Prison for Women and the work release centers, *Bragg*, 257 F.Supp. 3d at 1181; thus, the facts contained within are irrelevant to Plaintiff's action.  Second, Plaintiff's referenced citation to the U.S. Department of Justice report identifying that in June 2018 Holman was employing 20% of the authorized correctional officers (pg. 9), while extremely disturbing, does not show what Defendants Ivey and Dunn knew on or around April 2019.  Similarly, Plaintiff's citation to the U.S. Department of Justice's report that three Holman officers stated that "all" prisoners have a weapon of some sort (pg. 25) falls short of establishing that Defendants Ivey and Dunn were deliberately indifferent to his safety, when read in light of Defendant Dunn's affirmed testimony.  (See Doc. 54-1).

also have to show that Defendants Dunn and Ivey recklessly or knowingly declined to take actions to improve those conditions.  *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993) ("Mere knowledge of the infirm conditions persisting at GCI does not establish deliberate indifference. The plaintiffs must also demonstrate that, with knowledge of the infirm conditions, Turner knowingly or recklessly decline to take actions that would have improved the conditions.). Defendant Dunn, however, testifies through his affidavit that he and the Governor have reasonably responded to "find a remedy to the growing population at Holman Corr. Facility."  (Doc. 54-1 at 2).  Dunn describes departments implemented to curtail violence: (1) the Investigations and Intelligence Division, which investigates serious acts of violence which might give rise to criminal prosecution and gathers information on Security Threat Groups to preempt future criminal conduct, (2) the Inspector General's Office conducts routine security audits of facilities to ensure adherence to security policies.  Dunn further testifies that he (at the direction of the Governor) has created other measures to increase security and decrease violence at the state prisons, including Holman, i.e., creating two new security officer classifications (Correctional Cubical Operator and Basic Corrections Officer), engaging two experts on prison staffing to conduct system-wide staffing analysis and provide training to ADOC personnel to conduct future staffing analyses, enhanced

recruiting efforts for correctional officers, obtaining funding in January 2019 to hire 500 more correctional officers, increasing the staffing of the Investigation and Intelligence Division to reduce corruption and contraband, and instituting large-scale full facility searches to confiscate contraband (including weapons).  (Doc. 54-1).  Dunn specifically contends that in April 2019, the month which Plaintiff was assaulted), the Alabama prison population was reduced by 17 percent, from 24, 502 to 20, 342.   Accordingly, it cannot be said that Defendants Dunn and Ivey have acted with deliberate indifference to the overcrowding of Alabama prisons, as they have pursued strategies to combat the problem and curtail the violence.

Therefore, it is recommended that summary judgment be **GRANTED** in their favor.

**<u>Lieutenant Sandra Dailey and Officer Thompkins</u>**

Plaintiff alleges Lieutenant Dailey and Officer Thompkins were deliberately indifferent to his safety after they failed to move him to B-Dorm with knowledge of the dangerous environment in A-Dorm, that Inmate Hines was a confirmed enemy, and that he and Inmate Hines had just had "unfriendly words."  In support of their motion, Defendants contend they are entitled to qualified immunity because Plaintiff cannot show an Eighth Amendment violation against Defendants Dailey, and Thompkins. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (citation omitted). Since neither party disputes that Defendants were acting within the scope of their discretionary authority as correctional officers working at Holman at all times relevant to this case, the burden shifts to Plaintiff to show that Defendants violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id.*

19

The record (as discussed *supra*) blatantly contradicts Plaintiff's assertion that Inmate Hines was a documented enemy in the prison records prior to April 26, 2019. Thus, the court must determine if Plaintiff's remaining allegation established deliberate indifference on the part of the Defendants - that is that Plaintiff spoke to Defendants Dailey and Thompkins on April 26, 2019 about moving him from A-Dorm to B-Dorm "for fear of being in a physical confrontation" with Kelvin Hines because the two inmates had just had "unfriendly words with each other prior to the officers arrival." (Doc. 7 at 3). And, that Defendants responded that he should "get a knife and defend [him]self as best as possible, because we don't do movements." (*Id.* at 7). Based on *Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019), the court concludes Plaintiff's allegation is insufficient to establish an Eighth Amendment violation.

In *Marbury v. Warden*, a prison inmate repeatedly requested to be transferred or placed in protective custody due to widespread gang violence in the prison. The inmate stated he had heard from a friend that an unnamed prisoner intended to hurt him and that he was afraid of being hurt or killed. The prison officials did nothing, instead laughed and suggested he get a shank. The prisoner was stabbed and subsequently filed an action claiming the defendants were deliberately indifferent to the risk of an attack. The Eleventh Circuit affirmed (over a strong dissent) summary judgment for the defendants, concluding that, based on the evidence, a jury could not find that the officers were subjectively aware of a substantial risk of serious harm to the prisoner. Accordingly, to establish deliberate indifference to a substantial risk of serious harm, a plaintiff must show "gave prison officials further information enabling them to conclude that the risk was substantial and not merely possible." *Marbury*, 936 F.3d at 1236; *see also Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) ("Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.' *Marsh v. Butler Cnty., Ala.*, 268 F.3d

20

1014, 1028 (11th Cir. 2001) (en banc).'").   Stated another way, "officials must possess enough details about a threat to enable them to conclude that [the threat] presents a strong likelihood of injury, not a mere possibility."  *Marbury*, 936 F.3d at 1236 (citations omitted).

Here, there simply is not enough to show Defendants Dailey and Thompkins had subjective knowledge that Plaintiff faced a substantial risk of serious harm.  Plaintiff did not inform Defendants that the two were from rival gangs, that he needed protective custody, or feared for his life.  At most, Plaintiff has shown only a mere possibility of an assault by his allegation that the two inmates had "unfriendly words" in the TV room and that he wanted to go to a different dorm - that is not enough to establish deliberate indifference.  *See McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (vague allegations of "problems" with another inmate are insufficient to establish that defendant officers were aware of a specific risk of serious harm); *Woodyard v. Ala. Dep't of Corr.*, 700 F. App'x 927, 933 (11th Cir. 2017) (threat to stab was insufficient where the two inmates had no history of altercations and no reports of widespread violence), *but cf., Rodriguez v. Sec'y for the Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007) (allegation that inmate informed several guards that he had been threatened by his former gang and that he feared they would kill him when he was released into the general population was sufficient to overcome summary judgment  because a reasonable jury could find that the defendant officers were aware that the plaintiff inmate faced a substantial risk of serious harm from his former gang members after renouncing his membership).  Accordingly, Plaintiff cannot show that Defendants Dailey and Thompkins violated a constitutional right, and they are entitled to qualified immunity.    It is therefore recommended that summary judgment be GRANTED in favor of Defendant Dailey and Thompkins.

### Warden Cynthia Stewart, Warden Terry Raybon, and Captain Regina Bolar

Plaintiff contends Defendants Stewart, Raybon, and Bolar were aware of the dangerous environment created by over-crowding and staff shortages and, thus, acted with deliberate indifference by refusing his multiple requests to be transferred from Holman and/or moved from Holman's A-Dorm, causing his assault.

Turning to the first element of Plaintiff's claim, the Eleventh Circuit has declared many times over that a claim for a generalized risk of violence may only be established by showing "serious inmate-on-inmate violence was the norm or something close to it" – evidenced by

"pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Marbury* 936 F. 3d at 1234-35 (internal citations omitted).[10]  Plaintiff has alleged that he has witnessed 35 stabbings in the 3 months he was housed in A-Dorm, that a rival gang member was killed in A-Dorm in December 2018, that gang violence is common, and that guards are never assigned posts inside A-Dorm (day or night) for fear of the officers' safety.  (Doc. 46 at 2-3).

Review of the Post Assignment Roster confirms Plaintiff's allegation that no officer was assigned to A-Dorm at the time of his assault.  The Roster also appears to verify Plaintiff's allegation that officers are never assigned or posted inside A-Dorm.[11]  (Doc. 29-6 at 15-16).  It is

---

[10]     Review of Eleventh Circuit law confirms the high hurdle of establishing that a substantial risk of serious harm exists based on the general threat posed by inmate-on-inmate violence.  For instance:

In Harrison v. Culliver, 746 F.3d 1288 (11th Cir. 2014), the plaintiff presented evidence of 33 incidents on inmate-on-inmate violence over the span of three and a half years, four of which occurred in the same hallway where the assault of the plaintiff occurred, in a prison which housed

800-900 inmates. The Court concluded that the evidence presented was "hardly sufficient to demonstrate that [the institution] was a prison 'where violence and terror reign.'" Id. at 1300.

In Green v. Hooks, 2020 U.S. App. LEXIS 834 (11th Cir. Jan. 6, 2020), the record evidence that 28 reported incidents of sexual assault occurred over five years at the prison, which had a population of 1,500 inmates. While noting that sexual assault was "terrible", the Court found the numbers of incidents "did not rise to the level of demonstrating the [prison] was "a prison where violence and terror reigned." Id. at *34 (internal citation omitted).

Most recently, in Marbury v. Warden, 936 F.3d 1227 (11th Cir. 2019), the plaintiff affirmed he personally witnessed 15 inmate stabbings prior to the incident in which he was stabbed, he wrote letters to the warden asking to be moved to another dorm (he described his dorm as an "over-rated gang affiliated block"). Id. at 1231. The Court found the evidence insufficient to sustain an Eighth Amendment claim and clarified that precedent requires a plaintiff who alleges a generalized risk of harm to "point[] to specific features of a facility or its population rendering it particularly violent." Id. at 1235.

[11] Review of the Roster shows that while all cubicles were manned throughout Holman on April 26, 2019, A-Dorm was assigned a Rover in the morning but not in the evening. (Doc. 29-6 at 15-16). Indeed, the Post Assignment Roster reflects that Dorms A-E had a Rover assigned also undisputed that an inmate was murdered in A-Dorm in December 2018. Additionally, in response to this motion, Plaintiff has attempted (through two discovery motions) to obtain specific information and documentation evidencing the number of violent incidents which have occurred in A-Dorm (and Holman) and the Defendants' awareness of the issue. While noting that the evidence at trial may ultimately differ from that put forth here, at this summary judgment stage, the court determines that Plaintiff has carried his burden of showing pervasive staffing issues and living conditions which imply a reign of violence and terror in A-Dorm of which Defendants Stewart, Raybon, and Bolar would have been aware.

As to the subjective element of his claim, Plaintiff claims he personally spoke with Defendants Stewart, Raybon, and Bolar and requested to be transferred or moved to another dormitory away from his listed enemy Kelvin Hines. Defendants testify that this did not happen. Plaintiff further claims he submitted a letter to Defendant Stewart referencing earlier conversations with the supervisory defendants and further pleading for a dorm or prison transfer away from Inmate Hines. Defendant Stewart declares she never received the letter.

As previously discussed, Kelvin Hines was not documented as Plaintiff's enemy prior to April 26, 2019, despite Plaintiff's assertion or belief otherwise. However, the letter submitted by Plaintiff provides additional facts that a reasonable jury could find indicate a substantial risk of serious harm. The letter states that Plaintiff is housed with Kelvin Hines. Plaintiff describes how

he and Inmate Hines are members of rival gangs.  Plaintiff states that Inmate Hines is connected

with "the exact reason [Plaintiff is] incarcerated."  (Doc. 48-14).  Plaintiff maintains that the two

during the day shift, and B-Dorm and E-Dorm had a Rover assigned in the night shift.  Notably, it
is unclear to the court whether or not a "rover" is stationed within the dormitory or moves around,
as the term suggests, but clearly the record evidences no officer was stationed in A-Dorm on the
night of the incident in question.

inmates have a past history of "street drama".  (*Id*.).  Plaintiff points out that these facts put the two

"at odds".  The court notes that this is a close call, whether or not these communicated facts put

Defendants on notice of "a known risk of injury that rises to the level of a 'strong likelihood rather

than a mere possibility.'"  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citation

omitted).  However, the Eleventh Circuit has noted that "[i]n deliberate indifference cases, as in

life, context matters.  *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) (stating that "the

threshold of deliberate indifference is connected to combinations of diverse interdependent factual

elements").  In this context, Plaintiff's pronouncement that he was afraid for his life (given his and

Inmate Hines' gang affiliations and past history), coupled with the violence known to be pervasive

in A-Dorm, especially with gangs (if proven), was sufficient to make Defendants subjectively

aware of a substantial risk of serious harm to Plaintiff that should not have been ignored.  *Cf*.,

*Rodriguez v. Sec'y for the Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007) (observing that vague

statements like "I have a problem with another inmate in this compound" absent some information

"about the nature of the anticipated risk" are insufficient to create a genuine issue of fact regarding

deliberate indifference to a substantial risk of serious harm).

At this stage of the action, it is not the function of the reviewing court to weigh the evidence

and determine the truth of the matter; rather, it is to determine whether there is a genuine issue for

trial. *Anderson*, 477 U.S. at 252; *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d

1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied.")); *Kingsland v. City of Miami*, 382 F.3d 1220, 1227 (11th Cir. 2004), *cert. denied, De Armas v. Kingsland*, 543 U.S. 919, 125 S. Ct. 80, 160 L. Ed. 2d 203 ("The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment state, we must accept [Plaintiff's] version of the facts as true.) (citing *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)). Currently, the record before the court consists of Plaintiff's allegations of deliberate indifference to his safety and Defendants total denial of the same. Thus, there remain genuine issues of material facts and credibility determinations as to whether or not Defendants were aware of a substantial risk of serious harm based on Plaintiff's alleged notifications to them and Defendants denial of the same. Accordingly, the parties have presented evidence of a factual dispute that may only be determined by a trier of fact.

For this reason, it is recommended that summary judgment be DENIED as to Defendants Stewart, Raybon, and Bolar.

### C. FAILURE TO PROVIDE POST-TRAUMA CARE.

For denial of medical care to reach a constitutional violation, Plaintiff must again establish that Defendants demonstrated deliberate indifference to his health or safety, and he fails to do so here.

The objective component of an Eighth Amendment claim for inadequate health care requires that Plaintiff demonstrate the existence of an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need has been described as "one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." *Fernandez v. Metro Dade Police Dep't*, 397 F.

App'x 507, 511-512 (11th Cir. 2010) (citation omitted).   "In either of these situations, the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)).   The subjective component of Plaintiff's Eighth Amendment claim generally "inquires whether the officials acted with a sufficiently culpable state of mind." *Sims*, 25 F.3d at 983-84 (citing *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)).   The Supreme Court has declared that an official must have acted with deliberate indifference to a risk in order to implicate the Eighth Amendment.   In defining "deliberate indifference," the Supreme Court in *Farmer* stated:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. *See e.g., LaMarca v. Turner*, 995 F.2d 1526, 1535 (CA11 1993)…. It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

*Farmer*, 511 U.S. at 836.   Thus, the Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment.   *Id*. at 83940. Under this test, there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not . . . ."   *Id.* at 838.   It is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key.   *See, e.g., Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996).

Turning to Plaintiff's complaint, it is impossible to discern the exact injury sustained Plaintiff based on Plaintiff's vague, conclusory allegation that he has not been given psychological treatment or counseling "to enable Plaintiff in copying [sic] with severities of the mental tragedies in the aftermath of such a brutal and vicious attack!"   (Doc. 7 at 7).   While the court interprets

Plaintiff's *pro se* complaint with leniency and liberally construes it, a court does not have "license . . . to rewrite an otherwise deficient pleading [by a *pro se* litigant] in order to sustain an action." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (internal citations omitted), *overruled in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  Plaintiff's complaint, as he authored it, fails to demonstrate either prong of a deliberate indifference claim.

To start, Plaintiff has failed to establish that he suffered an objectively serious medical need.  The pleadings are completely void of observable symptoms or emotional symptoms to which Plaintiff claims Defendants were deliberately indifferent.  He has not described a specific time frame or duration of symptoms, nor has he discussed suffering from any specific post traumatic issue, including shaking, crying, nightmares, paranoia, hallucinations, anxiety, depression, difficulty sleeping, flashbacks, etc.  Moreover, Plaintiff does not allege that he ever informed Defendants he needed treatment following the incident.  Accordingly, Plaintiff has offered no evidence to suggest he had a serious medical need that, if left unattended, would pose a serious risk of medical harm, and neither has he shown that Defendants knew of a serious medical need and ignored it.  Plaintiff, therefore, has failed to meet his burden of proof.

Second, Defendants affirm (and Plaintiff does not dispute) that Plaintiff was referred to Mental Health on May 5, 2019 and was evaluated by a mental health professional on May 9, 2019.

In light of the forgoing, the undersigned finds Plaintiff has failed to carry his burden to overcome summary judgment, as Plaintiff has failed to establish that he suffered an objectively serious medical need or that Defendants were subjectively aware of a serious medical need.  It is recommended that summary judgment be **GRANTED** in favor of the Defendants on this claim, and the claim be dismissed.

### D.    CONCLUSION.

Based on the foregoing, the undersigned recommends that summary judgment should be **GRANTED** in favor of Defendants Ivey, Dunn, DeSpain, Conway, Dailey, and Thompkins, and Plaintiff's claim for denial of medical care or mental health treatment should be **DISMISSED**. Furthermore, summary judgment should be **DENIED** as to the Eighth Amendment failure to protect claim against Defendants Stewart, Raybon, and Bolar.

The Court hereby **ORDERS:**

1. Plaintiff's **Motions for Discovery** (Docs. 47, 49) are **DENIED** as Moot, given the denial of summary judgment as to Defendants Stewart, Raybon, and Bolar;

2. Defendants' **Motion to Strike** (Doc. 55) is **DENIED** as **MOOT,** for the reasons discussed in section I., D.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object.  In

the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 22nd day of September 2020.


/s/ Katherine P. Nelson
**UNITED STATES MAGISTRATE JUDGE**